BEASLEY v. SWINTON.

1. VENDOR AND VENDEE—MISREPRESENTATION—AGENCY—DAMAGES—COUNTER-CLAIM.—One having seen an advertisement of a farm, published by the agent of the owner, wrote to a friend, enclosing the advertisement and asking for information regarding the farm, and an opinion as to its value, and on receipt of an answer purchased it. In his answer the friend gave some information as to the condition of the place, but said nothing about the advertisement. It also appeared, that before writing he had made arrangements with the agent of vendor to share in the commissions, and after the sale, was paid a certain amount by agent of vendor. The farm was not as represented in advertisement. *Held,* that the vendee was entitled to recover damages as a counter-claim in an action for purchase money.

2. MISREPRESENTATION—DAMAGES.—The rule of damages for misrepresentation as to the condition of real property is the difference between the value of the property as represented and its value in its actual condition.

Before ALDRICH, J., Greenville, August 31, 1895. Modified.

REP.] November Term, 1895.

Action by C. C. Beasley against Thomas L. Swinton and Josephine S. Cuttino, for foreclosure of mortgage for balance of purchase money of certain lands in Greenville County, near city of Greenville, commenced September, 1894. The transaction was conducted by J. C. Smith, acting for the defendants, and by S. L. Beasley and Geo. H. Chapin, for plaintiff. The following is the correspondence:

Charleston, S. C., June 20, 1895. Mr. Julius C. Smith, Greenville, S. C.: Can you give me any information about the fruit farm for sale near Greenville? I enclose description of same, cut out from one of the papers. Give me your candid opinion as to price, and if you think any money can be made on it. Your early reply will oblige, yours, David S. Cuttino. N. B. Let me know how far it is from Greenville, and how far from a railroad station.

Greenville, S. C., 6–23, '93. Dear Sir: Your favor at hand. I want to make some inquiries about the matter you write about. As soon as I can get the information, will write. Hold up until I do. Yours, J. C. Smith.

Greenville, S. C., June 24, 1893. Mr. David S. Cuttino, Charleston, S. C.—Dear Sir: On looking into the circular you sent me, I find the place you allude to is on the south side of Paris Mountain, about three miles north of this city. It is well laid out for a fruit farm. It is near enough to raise early vegetables for the city, such as peas and early tomatoes, cantaloupes (melons not much), celery. The fruits, strawberries, cherries, grapes, will find sale or ready shipment. About $200 was cleared on strawberries this year. Grapes are almost a surety each year. Some years the rain causes them to rot, and then the crop falls much short. Small fruits, such as raspberries and cultivated blackberries, can find ready sale. Peaches, pears, figs, are a very uncertain crop, failing every other year. This hillside does not oftener than the lowlands. It has a fine well of very cold water, and also a cistern for watering, if necessary. It does not connect with the aqueduct. The place is cheap, and for any one who wishes to make the cultiva-

tion of the articles mentioned his aim and success, it is a good thing. There is plenty of land for that purpose. Land is plenty about it, but there is not enough to make it a paying farm, outside of the things named. House and outbuildings are in good order. I know the party who improved and built it up. He paid out, he claims, twice the amount he is now asking for it. His family must go back to Florida—hence his sale. I may be able to buy it for you at a few dollars less than the figures, but can't say. If you will give me your figures and instructions, I will carry them out, and it will cost you nothing, unless I can purchase for you at a less figure than the $2,000. Yours, Julius C. Smith. P. S. Come up and I will take you out.

Charleston, S. C., June 27, 1893. Julius C. Smith: Buy as cheap as possible. One thousand cash, balance in one and two years. Close promptly, some one after it. David S. Cuttino.

Greenville, S. C., June 27. To David S. Cuttino: Bought. How soon can you send one thousand? Answer quick. Julius C. Smith.

Greenville, S. C., June 27, 1893. Mr. D. S. Cuttino, Charleston, S. C.—Dear Sir: Your telegram came 12.10. Immediately saw the party, Chapin, and made him an offer of $1,800, and I think he was in a fix at once. While he declined to take the offer, he put himself in the fix of making me an offer of $2,000; and if I would give that price, he would close. While at the same time Mr. Beasley was up at the place with a Mr. Ravenole, from the City by the Sea. I closed the trade with him for the $2,000—$1,000 cash, balance in one and two years, at seven per cent. per annum interest, payable semi-annually; the cash, $1,000, to be paid on his giving a warranted title, subject to investigation by your attorney. The papers will have to go to Florida for signature and come back, and dower taken there. They wanted me to sign papers for you to pay on certain date, and, if not complied with at the date, a forfeit of $200 on each side—on theirs if they did not comply, or on yours

if you did not.   Hence my reason for telegram, and I shall fix the 10th of July.   He has had some ten to fifteen letters from parties in Charleston, Timmonsville, Summerville, Columbia, Edgefield, and various places, several parties asking for refusal until they can come up to see it. This Mr. R. is on the Savannah and Charleston R. R., conductor, wished it, but would make no offer, and rather wanted to wait for a day or so, was somewhat taken back when he heard me say to Mr. Beasley I had bought it from Chapin.   He so expressed himself, and thought the party was trying to force him to buy by Mr. Chapin's informing Mr. Beasley he had sold in his presence, and afterwards Mr. Beasley meeting me and I confirmed it.   I suppose you want the title made in you.   If not, advise by telegram, as the papers will be sent to Fla. to be made up. When will you want possession, and are you coming up to it yourself?   Beasley has a man on it who is working it— on what terms, I do not know.   This I hope will reach you by night of 28th, or probably 29th A. M.   If point to be settled, advise me about the title.   If in your name, all right; if in your wife's, telegraph me; or any other person outside of yours.   Yours, Julius C. Smith.

Julius C. Smith: Make titles name Thomas L. Swinton and Josephine S. Cuttino.   David S. Cuttino.

Charleston, S. C., June 29, 1893.   Mr. Julius C. Smith, Greenville, S. C.: Your letter 24th, telegram 27th, and letter 27th inst., have been received.   Accept many thanks for your prompt attention to the purchase of fruit farm.   Wired you this a. m. to have title made out in names of Thomas L. Swinton and Josephine S. Cuttino.   Am I to understand by the $200 forfeit, that if we do not meet our part of the contract as to date fixed, July 10th, we are to pay them $200 more, and if they fail to be ready by that date they pay us the $200, and have the privilege of withdrawing from the sale; or is it, that if we have the cash portion, $1,000, at the date fixed, and they not ready to turn over the papers, that the place is sold to us at $2,000, less $200, but if we

fail to have the $1,000 ready at the time fixed, we pay $2,200? Let me know at once about this, and also if the owner is to draw on us for the $1,000, or are we to have the $1,000 in your hands by the 10th of July. If it is to be in your hands ready to be paid to them on 10th of July, I will draw same from bank on Monday next, if necessary, and express it to you at once, as I do not wish any loop-hole for them to back down. I presume, if we have the money ready on the fixed date, they are compelled to turn the property over to us. Is Mr. S. L. Beasley the owner? I would like to know who is, so as to find out if he has any stock on hand, horses, cows, etc. Do you know if the buildings are insured; if not, can they be in Greenville, and at what rate? Mr. Swinton and myself are both coming up; that is our intention, if nothing happens to prevent. We would like to have possession by August 1st or sooner. We would like some one to be on the place to take care of it until one of us went up. Do you know what the prospect of the fruit crop is this season? Will we have any neighbors near us, or nearer than Greenville? Would be pleased to hear from you at your earliest convenience in reference to information desired. Again thanking you for what you have done, remain, yours truly, David S. Cuttino.

Greenville, S. C., July 31, 1893: Mr. David S. Cuttino, Charleston, S. C.—Dear Sir: You will please find enclosed titles for the land bought for you. Also receipt for the cash payment of $1,000. The bill of Haynsworth & Parker for $25. The amount of $10 will cover any and all charges I may have against you, making $35, the amount still due, all of which I hope you will find satisfactory and approved. The hack will cost you from two to three dollars, according to the number you may have. Mr. Beasley can send in his wagon, one horse, to carry out any light baggage or bedding you may have. A wagon, two horse, can be had from one dollar to one dollar and fifty cents, all of which I will arrange, if you will write me ahead how many. The car of furniture can be put where you want it to unload

after you get here.   There is wood land enough to supply the family, if used with economy.   It is not thick, having been cut out once.   The place is in the care of Mr. Beasley and will be until tomorrow, and then Mr. Hudson will be on it until you come up.   He is the same man Mr. Beasley has had with him to cultivate the place, Beasley paying him in part of the crop.   I have not made any further arrangement than to get Mr. Beasley to arrange for him to stay until you come, and then you can arrange yourself.   The grapes are ripening now (what there is of them) and he is marketing them, and also whatever there may be on the farm.   When you come, we shall have two churches to present to you to attend and worship at.   The first, or mother church, and the second, the Rutherford Street Church.   We are glad to welcome any additions.   Yours truly, Julius C. Smith.

Greenville, S. C., January 31st, 1894.—Mr. C. C. Beasley, St. Augustine, Fla.—Dear Sir: We wrote you some time ago (about October, 1893,) in reference to the complaint of Mrs. Josephine S. Cuttino and Thomas L. Swinton, growing out of the purchase by them from you, through your agent, George Chapin, of a tract of land in the county of Greenville, in this State, known as the Piney Mountain tract.   We having not received any answer from you to our letter, proceed to write you again.   Said parties purchased upon the faith of an advertisement appearing in the News and Courier, a newspaper published in Charleston, S. C., stating, among other things, that there were 100 pear trees on said place, 200 fig trees, and fifteen acres in peaches, and one new two-story building, ten rooms, surrounded by piazzas, one farm house with piazza, and one fruit packing house, forty feet.   They purchased said place without ever seeing it, on the representations of said advertisement.   They found only thirty-eight pear trees, and twenty fig trees; peaches short 500.   The dwelling had only eight rooms, and piazza only on one side at end; no piazza to farm house, and no fruit packing house at all.

They have had their damages estimated by competent persons, and they are as follows: Pear trees short, sixty-two, at $1 each, $62; fig trees short, at $1 each, $180; 500 peach trees short, at 50c. each, $250; one-story piazza round house, $324; putting two rooms on top of house, $300; painting the house as should be, $40; building plain piazza to farm house, $24; building packing house, 16x40 by 10 high, $87; total, $1,267. The above is the amount of damages claimed by said misrepresentations of said advertisement, and said parties have authorized us to inform you that they claim said amount, and will not pay anything on the note and mortgage given by them to you for balance of purchase money until said damage is settled. Very respectfully, Shuman & Dean.

(The following is a copy of the letter from C. C. Beasley, put in evidence:)

St. Augustine, Fla., February 10th, 1894.—Shuman & Dean—Gentlemen: I never answered your extraordinary letter received from you last October about Mr. Cuttino's business for the reason that I wished to see Mr. Chapin first, in order to know if he sold Mr. Cuttino the place under the description you gave me. Mr. Chapin is now here, and denies giving such a description. My description of the place is in several papers as well as Greenville papers, and can be found by going back two or three years, which is a very different affair from the one you gave me, and a fair statement of the place when I left. It also seems strange that the purchasers of the place, with every opportunity for seeing the place and inspecting the place, and living on it for so many months after the sale and in full possession of the premises. While not admitting any obligation or liability on my part, yet if it be true that the place was bought on misrepresentations, I am willing to return to the purchasers the amount paid by them upon a return and reconveyance of the place to me, provided that the place is in as good condition as at the time of the sale to them. Yours respectfully, C. C. Beasley.

The master, after careful investigation, filed the following report on June 26, 1895:

The master, to whom this cause was referred to take the testimony and report the same to the Court, together with his findings of fact and conclusions of law, would respectfully report, he has taken the testimony and herewith submits the same:

This is an action brought to foreclose a mortgage executed by the defendants to plaintiff. The allegations of the complaint are the usual allegations for this purpose. The defendants by their answer admit the allegations of the complaint, and set up by way of counter-claim that the notes secured by the mortgage sought to be foreclosed were given by defendants for the balance of the purchase price of the land included in the mortgage. That the defendants had purchased the tract upon the faith of an advertisement thereof made by plaintiff in which there were many misrepresentations; that defendants submitted the advertisement to Julius C. Smith, who resided near where the property was situated, in the expectation that he would examine the property and report to them; that he did so report, and that, relying upon his report, they purchased; but that plaintiff had fraudulently paid said Smith a commission for making the sale to defendants, and had otherwise fraudulently colluded with him to cause the said Smith to misrepresent to defendants the qualities of the tract and its value; that the place, as it actually was, was not worth, by reason of the misrepresentations, what it was represented to be, the sum of $1,720, and defendants ask for this amount as a counter-claim to plaintiff's debt, praying that they be given judgment against plaintiff for the excess of the counter-claim over the notes executed by them and sued on in this action. The plaintiff replying to the counter-claim denies the allegations thereof, and says, further, that the tract is reasonably worth the sum of $2,000, for which it was sold, and that the advertisement referred to by the defendants was a mere overture, offered by him to possible purchasers to

28—46

catch their attention, and induce them to make inquiries of the persons to whom he directed them for information.

The master does not think it necessary to repeat in this report the testimony taken, but he will only give his findings of fact and conclusions of law. As findings of fact, he finds:

1. That the advertisement referred to above was a mere overture offered by plaintiff, which it was not expected would be taken by any one as a positive representation of the condition of the place. The defendants themselves so understood it, for they sought, as they admit, a verification of it, and also sought for other information concerning the place to be purchased.

2. The defendants did not rely upon the representations contained in the advertisement, but, on the contrary, employed Julius C. Smith as their agent to examine the place and report to them upon the advisability of the purchase. Their agent did make a report to them, and they admit that it was upon the strength of the agent's report that they purchased. There is no claim of any misrepresentation being made by this agent; but even if made, it could not be held to affect the plaintiff.

3. The defendants' agent was paid by S. L. Beasley, a son of the plaintiff, $33.33, but this the master finds, was a voluntary payment, made without the knowledge of plaintiff, after the completion of the contract, and not made with any view to affect the character of the report of the agent to his principals, the defendants.

4. There was no fraudulent collusion by plaintiff or any representative of his with the agent of the defendants to cause the latter to make a false report as to the qualities or value of such tract. The well known high character of Mr. Smith is a sufficient refutation of this assertion, but there is, in any event, no testimony to sustain such view.

As conclusions of law, the master reports:

1. That the defendants not having relied on the advertisement, even if it be admitted they had a right to do, and

having, on the contrary, relied on the report of their own agent, upon the place purchased (there being no evidence of collusion by plaintiff with this agent), cannot avail themselves of any misrepresentations made in such advertisement. There can be no doubt that the place purchased is well worth the sum given for it.

2. That the defendants, having failed to establish their counter-claim, are liable for the full amount of the note sued on, and plaintiff is entitled to a foreclosure of the mortgage.

As a mixed finding of fact and conclusion of law, the master reports: That there is now due on the said note a considerable sum, but according to its terms the whole will be due July 1st, 1895; and as a matter of convenience, the master finds that there will be due on said note on July 1st, 1895, the sum of $1,144.90, for which sum and accruing interest plaintiff is entitled to a judgment of foreclosure.

From this report the defendants appeal, and Judge Aldrich made the following decree, August 31, 1895:

This action was brought to foreclose a mortgage executed by the defendants to plaintiff, and given to secure the purchase money of the real estate described in the complaint.

The defendants in their answer admit the allegations of the complaint as to the execution, delivery, etc., of the notes and mortgage; but, by way of counter-claim, set up a demand against plaintiff for the sum of $1,720, alleged to be the damage sustained by defendants in the purchase of the aforesaid mortgaged premises, and caused by misrepresentations and illegal conduct of plaintiff and his agents as to the said real estate, and in the sale thereof by plaintiff to these defendants. The action was referred to the master of Greenville County to take the testimony and report the same to the Court, together with his findings of fact and conclusions of law. The master has complied with the order of reference, and all the testimony taken by him, his report upon the facts and the law, together with the exceptions of defendants to said report, are now before me. The

master sustained the allegations of the complaint, recommends the dismissal of the counter-claim of the defendants, and reports that the judgment should be in favor of plaintiff and against the defendants for the foreclosure of their mortgage for the full amount of the mortgage debt.

The exceptions of the defendants are numerous and long, question every finding of the master, and practically reopen the entire case. The master's conclusions upon the facts are, to a very great extent, dependent upon his decisions of a few of the leading and controlling issues in this controversy. The other issues of minor consideration spring from these pivotal facts, and are, therefore, almost entirely dependent upon the decision of the main issues. The master's conclusions upon the legal issues are predicated upon his finding of facts, and if he is in error in his said findings, his legal conclusions are without foundation and erroneous.

I have read and reread the evidence in this case a number of times and have given much thought to the same, and I am compelled to differ from the master upon the leading issues of fact. While I have great confidence in the judgment of the master and would not lightly differ with him, still the defendants have the right to appeal from the master to this Court, and it is my duty to decide that appeal according to my best judgment upon the testimony and the law. I shall not endeavor to state the pleadings or the report of the master in either exact or technical terms, nor shall I consider the exceptions of the defendant *seriatim*, because I can accomplish all of these results, and in a far more satisfactory manner, by considering the case *de novo*, as it were, and in its entirety. In doing so I will, as I go along, refer to the pleadings, the testimony, and the findings of the master, and our differences will clearly appear.

On the first day of July, 1893, and for some time prior thereto, the defendant, Thomas L. Swinton, resided in the town of Beaufort, S. C., and the defendant, Josephine S. Cuttino, resided with her husband, D. S. Cuttino, in the city of Charleston, S. C. The plaintiff, C. C. Beasley, at

said time was the owner of the land described in the complaint. Some time in the latter part of 1891, plaintiff moved from said land and went to Florida to live, as his wife was in delicate health, and also because he had business interests in that State. He left the land in possession of his son and agent, S. L. Beasley. Plaintiff was anxious to sell the land, and employed one George H. Chapin, a real estate agent and broker, to sell the same. Said Chapin, as agent, was to advertise the place for sale. The place was advertised for some time prior to July, 1893. The price asked was $2,800, and Chapin was to be paid for his services, if sold at these figures, the sum of $200. No sale could be made at said figures, and plaintiff, being anxious to sell, made a new agreement with said Chapin, whereby Chapin was to sell the place for $2,000, and for his services as agent plaintiff was to pay him $100. This compensation to Chapin was dependent upon his making a sale of the premises at said price. S. L. Beasley, the son of the plaintiff, was also an agent of plaintiff, because he held the possession of the premises for him, and he acted as such agent in several important respects during said sale. I think, that S. L. Beasley acted as such agent at the request of plaintiff, made in a general way, long before the sale to these defendants was contemplated. That, however, is a matter of small moment, because he did act as such agent, and plaintiff, with knowledge of that fact, accepted and ratified the acts done by S. L. Beasley as his agent, and in this action he is trying to sustain the acts of both Chapin and S. L. Beasley as his agents in the contract sued upon. Both of these parties were the agents of the plaintiff, and, as such, represented him in the sale of the premises, as hereinafter described. George H. Chapin advertised the land for sale in newspapers published in Boston, Mass., in Florida, and in the cities of Charleston and Greenville, S. C. The advertisement, which constitutes one of the many controversies in this action, was published in the News and Courier, a well known daily newspaper, of wide circulation, published

in the city of Charleston, S. C. The date of the publication does not appear upon the face of the advertisement, but the undisputed evidence shows that it was published prior to July 1st, 1893, probably during the month of June, 1893. It was running in the said paper in June, 1893. The advertisement is as follows:

"Fruit Farm at Great Sacrifice.—Delightfully situated, overlooking the beautiful city of Greenville, S. C., on the Richmond and Danville Railroad, between Atlanta and Charlotte. 1,160 feet above the sea. Charming, all-the-year climate. Thirty-five acres—fifteen in peaches, two in strawberries, sold 3,000 boxes past season; 5,000 grape vines, expect 50,000 pounds this season; 100 pears, 200 figs, besides cherries, raspberries, quinces, blackberries. New two-story house, ten high rooms, surrounded with piazza; farm house with piazza; two-story stable; fruit packing house, forty feet; all in good repair; aqueduct water. A good living may be obtained from the fruit. Price only $2,000—$500 cash; balance in light annual payments. Owner's business in distant city compels sale. Apply to S. L. Beasley, on the premises, or to Geo. H. Chapin & Co., 257 Washington st., Boston."

D. S. Cuttino read this advertisement in said newspaper, and thinking that said place was such a fruit and vegetable farm as his wife, Josephine S. Cuttino, and Thomas L. Swinton, her uncle, desired to purchase, he called said advertisement to their notice: The advertisement caught their eyes—the place as described therein seemed to be what they wanted, and D. S. Cuttino, the husband and nephew, was appointed their agent to look into the matter, with a view to the purchase of the place, if found to be what the advertisement represented, for the defendants. D. S. Cuttino was acquainted with one Julius C. Smith, some time called in the evidence J. C. Smith, a business man residing in the city of Greenville, S. C. D. S. Cuttino and said J. C. Smith had formerly been friends—old acquaintances. As the agent of the defendants, and at their request, the said D. S.

Cuttino enclosed said advertisement in a letter to said J. C. Smith, of which the following is a copy:

Charleston, S. C,, June 20, 1893. Mr. Julius C. Smith, Greenville, S. C.—Dear Sir: Can you give me any information about the fruit farm for sale near Greenville? I enclose description of same, cut out from one of the papers. Give me your candid opinion as to price, and if you think any money can be made on it. Your early reply will oblige, yours, etc., David S. Cuttino. N. B.—Let me know how far it is from Greenville, and how far from a railroad station.

J. C. Smith received this letter, and his answer was:

Greenville, S. C., June 23, 1893. Dear Sir: Your favor to hand. I want to make some inquiries about the matter you write about. As soon as I can get the information, will write. Hold up until I do. Yours, J. C. Smith.

We come now to the unpleasant part of this case, and, as it relates to conduct of an equivocal character, to speak in mild terms, I shall, as far as I can, let the actors speak for themselves.

J. C. Smith testified: "My connection with this matter began with the letter of Mr. Cuttino, dated June 20th, 1893. Upon receipt of that letter, I wrote Mr. Cuttino the postal card in evidence. I then went to see young Mr. Beasley, and told him that I had a letter from a friend that desired to purchase the farm, and that I desired to do what I did in the matter of the purchase without any cost to him, as he had been a friend of long standing. He said his father had placed the farm in the hands of Mr. Chapin for sale, and that he had nothing to do with it. I then saw Mr. Chapin, and told him very much the same thing I had to Mr. Beasley, and asked him if there was anything in it for me, and he said: 'Yes, if you can sell it to your friend, I will give you one-third of my commissions.' "

Next J. C. Smith wrote the following letter:

Greenville, S. C., June 24th, 1893. Mr. David S. Cuttino, Charleston, S. C.—Dear Sir: On looking into the circular you sent me, I find the place you allude to is on the

south side of Paris Mountain, about three miles north of the city. It is well laid out for a fruit farm. It is near enough to raise early vegetables for the city, such as peas and early tomatoes, cantaloupes and celery. The fruits—strawberries, cherries, and grapes—will find sale on early shipment. About $200 was cleared on strawberries this year. Grapes are almost a surety each year. Some years the rain causes them to rot, and then the crop falls much short. Small fruit, such as raspberries and cultivated black-berries, can find ready sale. Peaches, pears, and figs are a very uncertain crop, failing every other year. The hillside does not oftener than the lowlands. It has a fine well of cold water, and also a cistern for watering, if necessary. It does not connect with the acqueduct. The place is cheap, and for any one who wishes to make the cultivation of the articles mentioned his aim and success, it is a good thing. There is plenty of land for that purpose, and land is plenty about it, but there is not enough to make it a paying farm outside of the things named. House and outbuildings are in good order. I know the party who improved and built it up. He paid out, he claims, twice the amount he is now asking for it. His family must go back to Florida—hence his sale. I may be able to buy it for you at a few dollars less than the figures, but I can't say. If you will give me your figures and instructions, I will carry them out, and it will cost you nothing, unless I can purchase for you at a less figure than $2,000. Come up and I will take you out. Yours, Julius C. Smith.

Mr. Smith did not go upon the premises, and only knew the place in a general way. The information given Mr. Cuttino was obtained from Mr. S. L. Beasley, in so far as that information consisted of specific facts. He was the party of whom he made the "inquiries." After the letter had been sent, J. C. Smith received the following note from George H. Chapin:

Greenville, S. C., June 24th, 1893. J. C. Smith, Esq.— Dear Sir: I have considered your request and cannot agree

to give you any part of the commissions on Beasley place
Yours, Geo. H. Chapin.

No compunction of conscience prompted this note, for
Geo. H. Chapin testified: "He (Smith) said he should ex-
pect me to give him a part of my commissions if his man
bought. After he left, I regretted that I had agreed to
share any portion of the commission with him should his
party buy, as I was having so many applications for the
property, and wrote him to that effect."

The aforesaid note of Geo. H. Chapin did not reach J. C.
Smith until June 25th, the day after his second letter was
written and mailed to Mr. Cuttino. But Mr. Smith knew
what a bargain was, for he not only demanded the amount
Chapin agreed to pay him, but also got it. Let Mr. J. C.
Smith speak for himself. He detailed, as a witness, how
he had written letters and sent telegrams to D. S. Cuttino;
received letters and telegrams from him, and how he closed
the trade by the payment of $10 or $20, and signing a
paper as the agent of Cuttino. He then adds: "The trade
had been closed. I said to Mr. Chapin as we went out to-
wards the door, you asked me the other day, in the presence
of Mr. Jordan, if I had received your letter. I answered
you yes, and said nothing further, because my order was to
buy promptly, and didn't wish to hamper the trade at all.
Matters are now closed, and I shall insist on your fulfilling
your promise; and he turned to Mr. Beasley and said, you
hear that; and there was nothing more said then, and we
parted and we all went out. We were to meet in the after-
noon, and the telegram didn't come, and I said to Mr. Beas-
ley, Mr. Chapin said to you, you hear what Mr. Smith said.
He, Beasley, said yes. After we left, Mr. Chapin spoke to
me about it, and insisted upon my giving a note for my
father to pay the $33.33. I told him that he nor his father
should pay the $33.33; that I would not take it. The
agreement was that Mr. Chapin was to pay it out of his
$100. I don't think anything more was said then. The
telegram did not come. I think the next day we met

again, and, coming together, I mentioned to Mr. Chapin
what Mr. Beasley had said, and I told him that Mr. Beas-
ley could not pay the amount and that he must pay it him-
self, and we had some words about it, and I expressed
myself pretty freely about the manner in which Mr. Cha-
pin had endeavored to get out of paying the money. I did
not know when I got the money, Mr. Beasley was paying
it, and when I gave the receipt expressed in it that the mo-
ney was coming from Mr. Chapin."

It is useless to pursue this subject further. Chapin held
back, and Beasley arranged for the money. Smith got it
and receipted for it as coming from Chapin. The only
friction between the agents was the dispute over the com-
missions, or the division thereof; never a word was said
about the propriety of that division. During all this time
Mrs. Cuttino, Mr. Swinton, and Mr. D. S. Cuttino were in
Charleston, trusting fully and implicitly to Mr. Smith.
He wrote a number of letters to D. S. Cuttino; sent him
telegrams; but these letters did not open the eyes of the ·
purchasers either to the fact that their agent expected pay
from Chapin for the work he was doing for them, nor did
he undeceive them as to the false statements in the adver-
tisement, or tell them the true condition of the premises.

The purchasers sitting quietly in Charleston, with im-
plicit faith in the advertisement, as corroborated by their
supposed agent, acting honestly, got Mr. J. C. Smith to
close the trade, and through him paid to the plaintiff $1,000
in cash, accepted the conveyance of the premises, and exe-
cuted and delivered the notes and mortgages sued on in this
action. They then closed up their business in Charleston,
disposed of the dwelling house, hired a car, moved to
Greenville bag and baggage, and went out to their new
home. But a glance, a casual examination, filled defend-
ants with dismay, and in a day or so—the next day—they
were back in Greenville, complaining to Mr. Smith—in-
deed, to every one interested in the matter and to whom
they could receive access. What did they find? Instead

of the "new two-story house, ten high rooms, surrounded with piazzas," as specified in the advertisement, they found a rough house, with only eight rooms and no piazza except a short one on one side.  Plaintiff has to admit this fact, but he says, owing to the location of the house, piazzas surrounding the house would not add to the house, and be of neither service nor comfort; that there is an attic or garret up in a third floor, next to the roof, partly completed, and that if a partition is run through the garret it will make two rooms.  The evidence shows that it would cost $300 to put two more rooms on said house, and $324 to put piazzas on three sides of said house.  Instead of "a farm house with piazza," there is a farm house without a piazza, and to put one there would cost $24.  There is a little quibbling in the testimony about this farm house piazza; an effort was made to show that at one time there was a sort of piazza there, and it is probable at one time there was what was called a "hood" of boards over the door, but these boards had fallen down before the sale.  Instead of a "fruit packing house, forty feet," as specified in the advertisement, there was no fruit packing house there.  It is and was an imaginary building, and it would cost over $80 to build such a house.  There was evidence that the loft of the stable was used as a packing house.  This, I presume, is correct, but that fact cannot account for the error in the advertisement, because the "two-story stable," and the "fruit packing house, forty feet," were both conspicuously and specifically enumerated in the same advertisement. Instead of the fifteen acres of land in peaches, there were only ten acres so planted.  It would cost $250 to plant five acres in peach trees.  Besides this great deficiency in the acreage, there were 500 peach trees missing from the ten acres that had been planted, to replace which would cost $250.  Instead of "100 pear trees," as advertised, there were but thirty-eight pear trees on the place, and sixty-two pear trees already set out and growing on the place would be worth $62.  And so, instead of "200 fig trees," there

were but twenty-three fig trees on the place, and 177 fig trees already set out and growing would be worth $177; and, also, instead of 5,000 grape vines, there were only 3,000 grape vines on the place, and 2,000 grape vines already set out and growing would be worth $200. It is useless to discuss this issue. No one denies the fact that the fruit farm, buildings, trees, vines, etc., fell far short of the representation stated in the advertisement. Even Mr. J. C. Smith, under oath as a witness, said: "I think when these gentlemen saw the place and its condition, after reading the advertisement, that they had cause to be dissatisfied, and I deeply sympathise with them."

Mr. Smith, says learned counsel, is an honest man; the master says: "There was no fraudulent collusion by plaintiff or any representative of his with the agent of the defendants to cause the latter to make a false report as to the qualities or value of said tract. The well known character of Mr. Smith is sufficient refutation of this assertion; but there is, in any event, no testimony to sustain such view."

I shall not gainsay what the counsel and the master have said of the high character of Mr. Smith, but in view of all the circumstances, and in the light of the testimony in this case, I hardly think that any one will cite in support of their assertion the language of Mr. Smith, above quoted. In my opinion, said statement reflects no credit upon either his head or his heart. While, according to one view of the testimony, the value of the items of property as represented in the advertisement, and which, in fact and truth, do not exist, is as represented in the counter-claim of defendants, to wit: $1,700, still I shall not adopt these figures as the correct amount, and for two reasons.

1st. It is difficult to fix the value of trees, vines, etc., because some allowance should be made for trees destroyed in the natural course of events; also, slight errors should not be viewed critically, and it is possible that these missing trees, vines, etc., might be replaced at a little less expense than that shown by the testimony of the witness. Such, in

my opinion, while not probably the case, may possibly be the fact.

2d. Because on January 1st, 1894, defendants, through their counsel to the plaintiff, fixed the amount of their damage as follows: Pear trees short, 62, at $1 each, $62; fig trees short, $180; 500 peach trees short, at 50 cents each, $250; one-story piazza around house, $324; putting two rooms on top of house, $300; painting the house as should be, $40; building plain piazza to farm house, $24; building packing house, $87. Total, $1,267; deduct item for painting, $40—$1,227.

I deduct the item for painting, because I do not see that either the advertisement stated or the contract called for paint upon the house. It will also be noted that several items are absent from the above statement—for instance, the 2,000 grape vines. I do not mean to say that defendants should be held strictly to their said statement, and that they are precluded from adding other articles thereto; but as they claimed these figures of plaintiff before suit was instituted, and for the further reason that I am satisfied if any error existed in them, such error is in favor of plaintiff. I conclude, and as a matter of fact hold, that the value of the articles or species of property represented in said advertisement as existing on the farm was, and is, the sum of $1,227. As a finding of fact, the master holds: "That the advertisement referred to above was a mere overture offered by plaintiff, which it was not expected would be taken by any one as a positive representation of the condition of the place." The advertisement is before the Court, and such instruments must be construed according to their terms. When a paper or written instrument is plain and unequivocal, when its meaning is free from ambiguity, it is the duty of the Court to give force and effect to its terms, and there is no need to resort to construing terms which construe themselves. The effect of a statement or representation contained in a written instrument, such as the advertisement in question, is an entirely different question.

The advertisement in express terms says the farm has a "charming all-the-year climate," and that there is a "fruit packing house, forty feet," upon it. Both of these statements are representations, the one as much as the other; yet the effect of these statements are entirely different. Any and all persons are presumed to have some knowledge of the climate in a given locality, and whether that climate is "charming" or otherwise, depends upon the individual views of the person considering the question. It is clearly a matter of opinion; and the assertion that the climate of a given locality is "charming all the year," is meant by the speaker as an expression of his opinion, and so understood by those to whom the opinion is expressed. But when a man says that there is a house on a certain lot or tract of land, he is not expressing an opinion, he is stating a fact; persons who hear the statement understand it as the assertion of a fact, and they believe that a house is upon that lot or tract of land, if they believe his statement. This presents a fact concerning which a third party has no general knowledge, such as exists in regard to climate. It is a fact asserted, a representation of the truth. The advertisement in question was intended to catch the eye of the reading public, and with the hope of securing a purchaser. When these defendants read it, the representation that the climate of the farm was "charming," that it was "delightfully situated," that it was "1,160 feet above the sea," must have been understood by them as an expression of opinion on the part of the writer, based upon facts known or within the general knowledge of ordinary men. But when they read the statement that certain houses of certain descriptions, the exact number and variety of trees, vines, etc., were upon the place, they knew that these statements were positive assertions of alleged facts, that these statements were representations of all the facts, and detailed as the truth. It is true, that an advertisement is often intended merely to attract attention, and to invite inquiry; but it is also true, that an advertisement may, and frequently does, contain

representations of fact, and when that is the case, these representations are like other statements; they are put in the advertisement for some purpose, presumably a proper one, as an aid to carry out the object of the advertisement by giving information to the reader; or they are put in, if false, to catch, cheat, and deceive the unwary. Why did Geo. H. Chapin insert in this advertisement statements apparently true, but in fact untrue? Perhaps, as the result of erroneous information, or more like reason; but these defendants were certainly not expected to know that these representations were false—on the contrary, they had the right to assume that said representations were true. This advertisement may have been intended as stated, as an "overture," if that term is used as meaning an offer to sell; but it was more than that, it was an offer to sell property, *accompanied by positive representations* as to the existence of the items of that property, and the conditions thereof.

I do not concur with the master in holding that the advertisement "was a mere overture offered by plaintiff;" and, on the contrary, I hold that said advertisement was and is just what it purports to be, when it enumerates and details the items of property upon the place, a representation of facts. It follows, from what I have said, that I cannot concur with the master in his finding that this advertisement "would not" be taken by any one as a positive representation of the condition of the place. I think "any one" would take it as meaning that very thing; and a refusal to take it in that sense would find no support in the advertisement, and would have to be based upon reasons nowise dependent upon that paper, such as a want of confidence in the truth of the representation. This advertisement was not the result of ignorance or accident, if Mr. Chapin's account of the preparation is true. He testified that the place, after having been advertised for some time, was the subject of a new conversation and a new agreement between himself and the plaintiff; and that is was agreed it should be sold upon the terms already stated. Mr. Chapin said to plain-

tiff, in St. Augustine, Fla.: "Now give me a full description, and in my memorandum book I took a fresh description of the place; and from this data I composed the advertisement for the News and Courier." So that this was a second advertisement, composed from a "fresh description," given by the plaintiff himself. The advertisement, upon its face, shows that it was prepared with care. Will either the plaintiff or his agent, Mr. Chapin, be now allowed to stultify themselves, and say they did not mean what was said in the advertisement? There is no other avenue of escape left open to them. The master's second finding is as follows: "The defendants did not rely on the representations contained in the advertisement; but, on the contrary, employed Julius C. Smith as their agent, to examine the place and report to them upon the advisability of the purchase. Their agent did make a report to them, and they admit that it was upon the strength of the agent's report that they purchased. There is no claim of any misrepresentation being made by their agent; but, even if made, it could not be held to affect the plaintiff."

The master is mistaken as to his statements of fact. The defendants did "rely" on the representations contained in the advertisement—at least, they swore to that fact. D. S. Cuttino testified: "I was induced to purchase the place from the advertisement and from the letter I got from Mr. Smith." Thos. L. Swinton, one of the defendants, testified: "I relied upon the statements on the advertisement and the correspondence of Mr. Smith and Mr. Cuttino, and hence was induced to go into the purchase of the place. I did not doubt that place was as advertised at the time I made the purchase. I supposed the statements in that advertisement were true. I did not doubt it in the least." Defendants did employ Julius C. Smith as their agent, as stated by the master; but I will take this matter up in connection with the third finding of the master.

In his second finding, the master says: "There is no claim of any misrepresentation being made by their agent (J. C.

Smith); but, even if made, it could not be held to affect the plaintiff." With due respect to the master, it seems to me that this entire case, pleadings, evidence, and even the arguments, fairly bristle with the "claims" of the defendants that Smith did make representations to them. Whether he made such misrepresentations to defendants or not, and whether, if made, they will affect the plaintiff, are yet to be considered.

The master's third finding is: "The defendants' agent was paid by S. L. Beasley, a son of plaintiff, $33.33; but this," the master finds, "was a voluntary payment made without the knowledge of plaintiff after the completion of the contract, and not made with any view to affect the character of the report of the agent to his principals, the defendants."

Here again I must differ from the master. It is true, that the defendants' agent was paid by S. L. Beasley, a son of the plaintiff, $33.33; but the master should have added, that S. L. Beasley was also the agent of his father, the plaintiff. The advertisement mentioned his name. The "memorandum of agreement," under date of June 27th, 1893, between C. C. Beasley, of St. Augustine, Fla., and David S. Cuttino, of Charleston, S. C., for the sale of this farm, is signed, "C. C. Beasley, by Lee S. Beasley, David S. Cuttino, by Julius C. Smith," and the receipt given for the $10, "received of David S. Cuttino by the hands of Julius C. Smith, * * * as part payment on the Beasley place," is signed "C. C. Beasley, by Lee S. Beasley." There is no doubt of his being an agent of the plaintiff; besides, plaintiff, after being fully informed of his son's acts as his agent, had adopted them, ratified them, and is now trying to enforce the contracts made by S. L. Beasley, either alone or in connection with George H. Chapin. The master finds that the payment of the $33.33 to Smith "was a voluntary payment made without the knowledge of the plaintiff after the completion of the contract." A voluntary payment. I have already at length given the history of this matter. Just as soon as J. C. Smith got Mr. Cuttino's letter, he sought Geo. H. Chapin, and the agree-

29—46

ment to divide the commissions—that Chapin was to pay Smith $33.33—was then and there made, and that Smith right afterwards wrote his letter to Cuttino. I need not recur to the facts that Chapin's letter had no effect upon Smith; that he notified Chapin that he would hold him to the bargain; that L. S. Beasley knew of it; that L. S. Beasley finally fixed up a plan whereby J. C. Smith got his money, and gave a receipt to Chapin for it as though Chapin had paid it. Geo. H. Chapin testified that before Smith was paid, he said to Lee S. Beasley: "If Smith has $33.33, your father must pay it, and this Mr. Beasley agreed to, giving a written agreement to that effect, which I now have." Before the plaintiff signed the deed to defendants, he says in his testimony that he had been informed "that Mr. Chapin had agreed to give one-third of his fee of $100 to Mr. J. C. Smith for his assistance in effecting the sale. * * * I don't recollect that I authorized my son, S. L. Beasley, to retain said amount for the payment of Mr. Smith, but my recollection is that I did not, and that he or Mr. Chapin assumed the responsibility of doing so without any instructions from me." So plaintiff's money was used to pay Mr. Smith, and plaintiff, informed of the fact, acquiesced in the acts of his agents. Mr. J. C. Smith in his evidence dwells upon the correspondence between himself and D. S. Cuttino. As a witness he says: "I did not understand from the letter that I was called upon to go upon the place and make any report as to the value of the buildings or the fruit. I only understood that I was to answer as to the value of the place, as requested in the letter. On the 24th of June, I sent this letter, the same letter in evidence. I did not intend that this letter should be a confirmation of the representation made in the advertisement of the News and Courier. I consider the place cheap at the price mentioned in it."

D. S. Cuttino, in his first letter to J. C. Smith, enclosing the advertisement in it, says: "Can you give me any information about the fruit farm for sale near Greenville? I enclose description cut out one of the papers. Give me your candid

opinion as to the price, and if you think any money can be made on it." For what purpose was the advertisement sent to Mr. Smith, and how did he treat it? His letter of June 24th, 1893, answers these questions. In it he says: "On looking into the circular (advertisement) you sent me, I find the place you allude to is on the south side of Paris (Piney) Mountain, about three miles north of the city. It is well laid out for a fruit farm. * * * It does not connect with the aqueduct. * * * House and out-buildings are in good order." The letter, as will be seen, gives information as requested, and a favorable report of the fruit upon the place, mentioning various kinds of fruit upon the place, and how much was made from the sale of a part, etc.

If this letter was not calculated to produce conviction upon the minds of defendants that the advertisement was true, it has no force or effect. It in terms refers to the "circular"—states that the place is well laid out for a fruit farm; that the house and outbuildings (those mentioned in the advertisement) are in good order, and even points out one error in the circular, viz.: that it (the cistern) does not connect with the *aqueduct*, underscoring the word aqueduct. What suggested "aqueduct" to his mind, if the advertisement did not; and why correct the error in the advertisement in this respect, and report the condition of the houses, if his purpose was not to give "information" as to the statements of the advertisement, and to convince defendants of the truth of them? His letter did its natural work, and I must hold that it confirmed the truth of the representations in the advertisement, with a single correction thereof. When Mr. Smith wrote that letter he had not been upon the farm; it was after he had made his agreement to divide commissions, and he got the most of the information as to details therein stated from young Mr. Beasley, the agent of the seller. The reading of the letter would produce the impression upon the minds of most persons that Mr. Beasley had been upon the place; otherwise, how did he know that it was well laid out for a fruit farm—that the houses were

in good order, and that the aqueduct was not there?   If Mr.
Smith did not go upon the place, and he relied upon the ad-
vertisement and what the agent of plaintiff told him, in
making the purchase, plaintiff is still bound by the repre-
sentations in the advertisement, and those made by his
agents, and there is no evidence that plaintiff or his agents
ever hinted to Smith that a single statement in the adver-
tisement, except that one in reference to the aqueduct, was
untrue or intended as "a mere overture" of sale.   The
learned counsel for plaintiff in their able argument pro-
duced in writing and submitted to the Court, say: "It is
admitted that the general doctrine is, that one cannot be an
agent for both parties; and that upon its being discovered
that the agent is acting for both parties, either party who
closes the contract without knowledge of the agent's dual
capacity may rescind."   Counsel lays stress upon the rights
of the party imposed upon to rescind the contract, and
argues that it is the duty of one imposed upon to relinquish
the bargain as soon as the impositon is discovered.   Pass-
ing, for the present, the question of rescinding, let us return
to the question of dual agency.   Christ said: "No man can
serve two masters, for either he will hate the one and love
the other, or else he will hold to the one and despise the
other.   Ye cannot serve God and Mammon."   Will the
servant or an agent "hold" to that master or principal who
regards his services with money, and "despise" that master
or principal whom he serves as a friend?   Is the love for a
friend stronger than the love of gold?   In a contest between
Mammon and friendship, which is apt to prevail?   Mr.
Pomeroy, in his great work upon Equity Jurisprudence,
after an exhaustive discussion of agencies and fraud on the
part of agents, gives us the law upon the subject.   He says:
"An agent should unite his personal and representative
character in the same transaction, and equity will not per-
mit him to be exposed to the temptation or brought into a
situation where his own personal interests conflict with the

interests of his principal, and with the duties which he owes to his principal." Pom. Eq. Jur., 2 vol., sec. 959.

"Any unfairness, any underhand dealing, any use of knowledge communicated to the principal, any lack of perfect good faith which duty requires, renders the transaction voidable, so that it will be put aside at the option of the principal." *Ib.*, sec. 959. "Nor is an agent employed to purchase or to sell, or in any other business, permitted to make profits for himself in the transaction, unless by the plain consent of his employer; for all such profits wrongfully made he must account to his principal." *Ib.*, sec. 959.

In note 1, page 1386, to said sec. 959, Mr. Pomeroy says: "For the same reason, an agent cannot, unless expressly authorized by both, act as such for the principals whose interests are conflicting; a contract thus made without the knowledge and consent of each would not be enforced, and might be cancelled."

In the recent case of *Panama etc. Tel. Co.* v. *India Rubber etc. Co.*, L. R., 10 ch., 515, James, L. J., laid down the following rule: "I take it to be clear, that any surreptitious dealing between one principal and the agent of the other principal, is a fraud on such other principal cognizable in this Court. That I believe to be a clear proposition; and I take it to be equally clear, that the defrauded principal, if he comes in time, is entitled at his option to have the contract rescinded; or, if he elects not to have it rescinded, to have such other and adequate relief as the Court may think right to give him." Note, page 1386, Pom. Eq. Jur.

The same learned author, in his discussion of the general doctrine of the duty of principals to disclose certain facts in the making of contracts, says that "While the silence of the principal is sometimes permitted," adds, "If, in addition to the party's silence, there is any statement, even any word or act on his part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is

overstepped, and the concealment becomes fraudulent." *Ib.*, sec. 901. In the same section it is said: "The same is generally true of all other species of contracts and transactions, especially those species of agreements or engagements which are, in their very essential nature, intrinsically fiduciary, involving a condition of absolute faith." Was not the employment of J. C. Smith by defendants as their agent, an agreement essentially and intrinsically of a fiduciary nature, and did it not involve "a condition of absolute good faith?" The late Judge Kershaw, in a decree worthy of that distinguished judge and jurist, in discussing frauds in public sales, states the law applicable to private sales, in so far as this case calls for a statement of the rule of law. I refer to *Barrett* v. *Bath Paper Co.*, 13 S. C., p. 142–3. He says: "It has been well said, that in every public sale, as there are but two leading interests, so there are but two parties— those engaged in vending and those proposing to purchase the property. These are necessarily antagonistic, because their interests are directly opposed, the one to the other. It is the interest and well understood intention of the vending party to sell as high, and of the purchasing party to buy as low, as possible. * * * It is the function of the public policy to secure either of these classes. It simply requires that each, in the prosecution of his own interests and in the exercise of his own rights, shall act fairly. * * * No trick, no circumvention, will be allowed to prevent it."

I must overrule the second and third findings of fact by the master, and hold that the defendants did rely upon the representations contained in the advertisement; they did employ Julius C. Smith as their agent to represent them in the purchase of the farm from the plaintiff, and of such agent asked for information about the farm, his opinion as to the price thereof, and if money could be made on it. Said Smith, after accepting said employment as agent of defendants, sought Geo. H. Chapin, the agent of plaintiff to sell said farm, and said Smith and Chapin entered into an agreement that Chapin would pay Smith $33.33, if de-

fendants bought the farm. Neither Smith, Chapin or any one else, informed defendants of such agreement, and they never heard of it until after the transaction was completed. Said Smith, after making said agreement with Chapin, and as agent of defendants, wrote to them a letter in glowing terms, which produced the conviction upon the minds of the defendants that the representations in the advertisement were true, save that relating to the aqueduct, and that the farm was quite valuable; upon the "strength" of said advertisement and the report of said Smith, defendants purchased the place. Said Smith, in his said report, did make representations, and these representations affect the plaintiff. The master, in his fourth finding, says: "There was no fraudulent collusion by plaintiff, or any representative of his, with the agent of the defendants to cause the latter to make a false report as to the qualities or value of such tract." I hold that the contract between J. C. Smith and Geo. H. Chapin, above stated, was, under the testimony in this case, fraudulent, that it was "collusion" between said parties; and while the report of Smith to defendants may not have been "false" as to the qualities or value of the farm, it was a "false" answer to the main question asked of him, to wit: for "information about the fruit farm for sale near Greenville," accompanied by the advertisement, in that said answer, with one exception, was calculated to, and did, cause defendants to believe that the representations of said advertisement, with a single exception, were true. Upon this the defendants acted. Upon this question of agency, I think that plaintiff is responsible for the acts of Chapin, as his agent, and done within the scope of said agency. Plaintiff employed Geo. H. Chapin, as real estate broker, to sell this farm for a certain amount, payable in a certain time or times. This was a general agency to sell, and Chapin had the right to advertise the property and employ sub-agents in aiding him to make the sale. That was within the scope of his agency. He, Chapin, agrees with Smith to pay him a certain amount, if he got a party to buy; that made Smith

the agent of Chapin. Plaintiff was informed of the agreement between Chapin and Smith, and the result of it. With this knowledge he accepted the result of said agreement; his money has paid the consideration of said agreement; he insists that the contract must stand, has brought this action to enforce it, and he has, therefore, ratified and confirmed the acts of Chapin and Smith, and is bound by them. In addition to this, and, as I have already shown, plaintiff knew of the agreement between Chapin and Smith, and the result thereof, before he signed the deed to defendants, and before the contract of sale was executed. Fully informed, he said nothing, acquiesced in the acts of Smith and Chapin, and is seeking to avail himself of so much of these acts as will put money in his purse, and to repudiate such of these acts as will cost him money. He cannot do this. He has made his election, and is bound to answer for said acts of Chapin and Smith.

It was alleged by plaintiff in his pleadings, and there was evidence in support of same, that even if the items of property proven not to be upon the place were wanting, still the farm as it stood, without said property, was worth $2,000 or more, the price at which defendants purchased it. I cannot see how this fact, even if we admit the truth of it, can affect this case. Persons make their own contracts. Suppose the farm is worth $10,000, plaintiff had a right to sell it for any price he saw fit to accept. Defendants were not bound to buy the place; and when they bought it, they bought not only the land, but also every item of property enumerated in the advertisement. That was the contract. If the plaintiff can be excused from the failure to deliver the fruit-packing house, he could escape from a failure to deliver the dwelling house; and the same rule would apply to each item of property sold to defendants as being upon the place. The Court cannot make contracts for parties. It cannot regard any provision of a contract as being of no force or effect, because to strike out or ignore one or more of the terms or provisions of a contract is practically mak-

ing a new contract. It is the duty of the Court, first, to
decide what the contract as made by the parties thereto is,
and then to enforce it. I can see no reason for allowing
plaintiff to require defendants to pay him for fictitious trees,
vines, piazzas, houses, etc., because he has sold defendants
a tract of land. But, as a matter of fact, was the fruit farm,
without the missing items of property, worth $2,000? Ac-
cording to some of the testimony, it was a delightful home,
within three miles of the city of Greenville, a place noted
for the intelligence and wealth of its business men; yet it
was advertised for sale, and upon the market for months
and years at the sum of $2,800. It went begging for a pur-
chaser, but no one would buy. The price was reduced to
$2,000, and, strange to say, though that fine property was
being sacrificed for only $2,000, it could find no purchaser
in Greenville; advertised in many and distant localities, it
never found a purchaser until these rather credulous de-
fendants purchased it in the manner stated, without ever
having seen the property. Circumstantial evidence is some-
times stronger than positive testimony, especially where the
witnesses are interested. After the sale was completed, and
the deed, dated July 1st, had been delivered, the defendants
began to arrange to move upon the place. Their business
in the low country was disposed of, property was disposed
of, furniture, etc., packed and sent in a chartered car or cars
to Greenville, tickets were bought, and on August 17th,
1893, defendants first saw the place. The possession had
nominally been given to them, and they landed upon the
premises with their property with them. What were they
do—go in or stay out? They went in, took possession,
and, after attending to matters requiring immediate atten-
tion, they walked out to view the place. They noted that
this item was wanting, then another, and still another.
Surprised and indignant, they complained of the imposition
practiced upon them. The day after defendants saw the
place, Mr. Cuttino and Mr. Swinton went to Greenville,
hunted up Mr. J. C. Smith, and told him how much they were

disappointed in not finding the place as represented, and of their dissatisfaction thereat. Mr. Cuttino first heard of Mr. Smith having been paid money by Chapin in Smith's store, when settling some accounts, and he says: "I was so incensed that I settled my bill and went out of the store." Defendants even saw attorneys, and had them to write to J. C. Smith about the "misrepresentations" he had made to them about the place. Defendants next went to see Messrs. Haynsworth & Parker, the attorneys who had drawn their deed, and whose bill they had paid, and endeavored to get some information. Mr. Haynsworth testified: "Mr. Cuttino and Mr. Swinton went to my office very shortly after they moved up here. They seemed to think that Mr. Smith was to blame, and I stated to them that we could not take any case that would in any way involve Mr. Smith." Defendants then went to their present counsel, Messrs. Shuman & Dean, and have since acted under their advice. On September 6th, 1893, they notified Mr. J. C. Smith by lettter of the intention of defendants to hold him responsible for his misrepresentations. Mr. Smith answered this letter on September 12th, 1893, denying his liability. By direction of defendants, Shuman & Dean, in October, 1893, wrote to plaintiff, informing him of their demand for damages, giving the grounds, etc., upon which the claim was predicated. Plaintiff admits that he received the letter, but did not answer it. On January 31st, 1894, Messrs. Shuman & Dean wrote a second letter to plaintiff, in which, after stating wherein plaintiff had damaged defendants, and the amount thereof, viz: $1,267, say: "The above is the amount of damages claimed by said misrepresentations of said advertisement, and said parties (defendants) have authorized us to inform you that they claim said amount, and will not pay anything on the note and mortgage given by them to you for balance of purchase money until said damage is settled." Plaintiff, in his answer to their letter, after denying that he had given the description of the place as sent to him, and saying that Mr. Chapin also denied having

given the description, says: "While not admitting any obligation or liability on my part, yet if it be true that the place was bought on misrepresentation, I am willing to return to the purchasers the amount paid by them, upon a return and reconveyance of the place to me; provided that the place is in as good condition as at the time of sale to them." It will be noticed that plaintiff does not offer to rescind the trade; he only says he is "willing" to do so, "if it be true that the place was bought on misrepresentation," so that the rescission was conditional and contingent, depending upon the truth of defendant's claim, and he is to-day in court trying to prove that said claim is not true.

I cannot see much in his so-called offer to rescind. But suppose he had left out the conditions stated in his letter, and even tendered the $1,000 back to defendants upon the sole condition of their reconveyance of the property to him, the defendants would be justifiable in refusing to accept such an offer, because it would cause them serious loss. Leaving out any probable loss sustained by defendants in closing out their business as conducted at the time of the purchase, without reference to any loss they may have sustained in moving, defendants had expended money upon the faith of this purchase. They paid to Messrs. Haynsworth & Parker $25 for drawing the deed to them; this included a charge for perfecting plaintiff's title to the place. They paid the cost of transporting their goods to Greenville; they paid their passage money up, and for hacks and wagons to carry them and their goods to the place. They cared for the place; expended money, labor, and care upon it, and it is fair to presume paid the taxes due the State and county upon the property. Plaintiff made no offer to repay any one even of these items; and to have accepted plaintiff's offer in February, 1894, when it was made, would have left them without a home, and under the necessity of going to the expense of moving from the place and of finding a new home. I think that the advice given them by Messrs. Shuman & Dean, as evidenced by their letter to plaintiff, was sound, and that

defendants did exactly right in retaining possession of the place and pursuing the course they have adopted. Did the defendants have the right to rely upon the representations contained in the advertisement? The nature of fraudulent misrepresentations, their requisite element of being designed and naturally operating to induce third persons to act, are so fully illustrated by the rule concerning the effect of prospectuses, circulars, reports, and other similar documents issued by the proprietors, directors or other officers of corporations, as established by very recent decisions, that a statement of these rules may be proper: "Those who issue a prospectus holding out to the public the great advantages which accrue to persons who will take shares in a proposed undertaking, and inviting them to take shares on the faith of the representations therein contained, are bound to state everything with strict and scrupulous accuracy, and not only to abstain from stating as facts that which is not so, but to omit no one fact within their knowledge the existence of which might in any degree affect the nature or extent or quality of the privileges or advantages which the prospectus holds out as inducements to take shares." Pom. Eq. Jur., sec. 881.

"It may be laid down as a general proposition that when the statements are of the first kind (viz.: of facts), and especially when they are concerning matters which from their nature or situation may be assumed to be within the knowledge or under the power of the party making the representations, the party to whom it is made has a right to rely on them; he is justified in relying on them, and, in the absence of any knowledge of his own or of any facts which should arouse suspicion and cast doubt upon the truth of the statements, he is not bound to make inquiries and examination for himself. It does not, under such circumstances, lie in the mouth of the person asserting the facts to object or complain because the other took him at his word; if he claims that the other party was not misled, he is bound to show clearly that such party did know the real facts; the

burden is on him of removing the presumption that such
party relied and acted upon his statement." Pom. Eq. Jur.,
sec. 891.

"If a statement of facts actually untrue is made by a per-
son who honestly believes it to be true, but under such cir-
cumstances that the duty of knowing the truth rests upon
him, which, if fulfilled, would have prevented him from
making the statement—such misrepresentations may be
fraudulent in equity, and the person answerable as for fraud;
forgetfulness, ignorance, mistake cannot avail to overcome
the pre-existing duty of knowing and telling the truth."
Pom. Eq. Jur., sec. 888.

"If, therefore, a representation made prior to the transac-
tion, and directly relating to it, is of such a character that
it would naturally induce or tend to induce any ordinary
person to act upon it, and enter into the contract or engage
in the transaction, and is, in fact, followed by such action
on the part of the other person, then it will be presumed
that it was made for the purpose and with the design of in-
ducing that person to do what he has done—that is, to en-
ter into the agreement or engage in the transaction. The
design will be inferred from the natural and necessary con-
sequence." *Ib.*, sec. 880. "It may be regarded as a prin-
ciple definitely settled by the decision of our courts, that in
actions on contracts, a defendant at law as well as in equity
may avail himself of the misrepresentations of the plaintiff
in relation to the consideration of the contract, whether
they were made through fraud or mistake." *Means* v.
*Bricknoll*, 2 Hill, 657. A party purchasing land under
misrepresentations may, when sued for purchase money, set
up the land by way of counter-claim. Code, sec. 171; *Means*
v. *Bricknoll*, *supra; Mitchell* v. *Pinckney*, 13 S. C., 209–
210; *Tunno* v. *Fludd*, 1 McCord, 121; *Charleston* v. *Blohem*,
15 S. C., 126; *Commissioner* v. *Smith*, 9 Rich.; *Adams* v.
*Kibber*, 7 S. C., 58; *Abercrombe* y. *Owings*, 3 Rich., 137. I
will not protract this already long decree in further en-

deavor to apply the law to the various circumstances here-
inbefore stated, but will state my conclusions of law:

I hold that the defendants did rely upon the representa-
tions of facts stated in the advertisement, and that they had
the legal right to do so; that they also relied upon the
statements of Julius C. Smith—believed by defendants to be
their agent—but, in fact, said Smith, in consideration of an
agreement to be paid a certain sum of money by plaintiff's
agent, became also the agent of plaintiff, and all this with-
out the knowledge of defendants; that said report induced
defendants to believe that the representations in the adver-
tisement, with one exception, were true; that the said rep-
resentations in said advertisement were not true; that these
misrepresentations have damaged defendants to the amount
of $1,227. That the defendants, having sustained their
counter-claim, which they had the right to set up, are en-
titled to judgment for the amount thereof, to wit: $1,227.

That the complaint of the plaintiff should be dismissed,
his demand for foreclosure refused; that the notes and mort-
gage described in the complaint, being for a less amount
than the counter-claim, should be deducted from the amount
of said counter-claim, as of the date of the contract, and
defendants should have judgment against plaintiff for the
amount of the excess of said counter-claim over said mort-
gage debt—that is to say: Counter-claim allowed, $1,227;
amount of mortgage debt, 1,000—excess of counter-claim,
227. Amount of judgment in favor of defendants and against
plaintiff, $227. Wherefore, it is ordered, adjudged, and de-
creed, that the defendants have judgment, and the same is
hereby granted in their favor and against the plaintiff, for

1st. That the complaint of the plaintiff be and is dismissed.

2d. That plaintiff do deliver forthwith to defendants or
their attorneys, the notes and mortgage described in the
complaint, the same being without force or effect, and satis-
fied and discharged by the judgment herein.

3d. That the register of mesne conveyance in and for the
county of Greenville, do mark upon the record of the mort-

gage described in the complaint herein, the words, "satisfied and discharged by order of the Court of Common Pleas," with a reference to this decree, in apt and proper words.

4th. That the defendants have and are hereby granted judgment in their favor and against plaintiff for the sum of $227.

5th. That the plaintiff do pay the costs and disbursements of this action.

6th. That defendants have leave to apply in this action for such further order or process as may be necessary to carry into effect the order herein, and to enforce compliance with the terms of this decree.

From this decree the plaintiff appeals on the following exceptions:

I. Because his Honor erred in his finding of fact, that "the value of the articles or species of property represented in the advertisement published in behalf of plaintiff as existing, but which did not exist at all at the time defendants purchased the farm, was and is the sum of $1,227."

II. Because his Honor found as a matter of fact that it would cost $300 to add two more rooms to the house; whereas he should have found it would cost not over $20 so to do; and because he found it would cost $320 to put piazzas around the house; whereas he should have found that neither the additional rooms or the piazzas, if built, would add anything additional to the valuation of the place.

III. Because his Honor held as a matter of fact that there was no piazza to the farm house, and there was no "packing house."

IV. Because his Honor held that the value of the five acres of peaches, the alleged deficiency of the land asserted to have been planted in peaches, was $250; whereas he should have found that the assertion of this acreage was a mere matter of opinion, for which the vendor could not be held responsible; that this representation did not purport to be founded on survey.

V. Because his Honor erred in holding that the plaintiff must be held strictly to the representations contained in said advertisement; whereas he should have held that said advertisement was intended by plaintiff as a mere overture, not expected to be taken as an exact representation of the place; that it was so understood by defendants, and that from the loose, conjectural character of the statements, they were not justified in relying thereon.

VI. Because his honor found as a matter of fact that the defendants were entitled to $250 for 500 peach trees alleged to have been missing out of the ten acres, the number claimed by defendants to be planted in peach trees.

VII. Because his Honor erred in his mode of calculation of the damages sustained by defendants in consequence of the alleged misrepresentations made by plaintiffs, it being submitted that the proper mode of estimating the damages is not the amount necessary to be expended to make good the representations, but it is the difference in value between the place as it now is and the value of the place if it were as represented.

VIII. Because his Honor erred in finding as a matter of of fact that there was a deficiency of 62 pear trees of the value of $1 each, and 180 fig trees of the value of $1 each; whereas he should have found that there were 100 pear trees, as represented in the advertisment, and fifty fig trees.

IX. Because his Honor held that the defendants relied on the representations contained in the advertisement; whereas, having found that before purchasing they employed an agent to make inquiries and investigations, upon whose report they purchased, he should have found that the defendants did not rely on the representations contained in the advestisement, but, on the contrary, on their agent's report.

X. Because his Honor held that if Mr. Smith, the agent of defendants, did not go upon the place, and relied on what the agent of plaintiff told him in making the purchase, plaintiff is still bound by the representations in the advertisement and those made by plaintiff's agents; whereas

he should have held that said Smith did not rely on any statements made by plaintiff's agents, but, on the contrary, made a report based on his own knowledge; and he should have found further that the said Smith had it within his means of knowledge to ascertain the truth of said representations, and defendants must, therefore, be held to the knowledge which could thus have been obtained.

XI. Because his Honor held that the said Smith, in his report, made misrepresentations which bind the plaintiff; whereas he should have held that Smith, being the agent of defendants, plaintiff could not be affected by any misrepresentations made by him.

XII. Because his Honor held that the agreement made between said Smith and Geo. H. Chapin for a division of commissions was fraudulent and collusive, and that plaintiff was affected by such fraud.

XIII. Because his Honor held that the said Julius C. Smith was called upon, on receipt of the letter from D. S. Cuttino, to make inquiries as to the truth of the statements contained in the said advertisement, and to go upon the premises and make examination there, and that the letter of the said Julius C. Smith was a representation of the truth of all the statements contained in the said advertisement; whereas he should have held that whilst the said D. S. Cuttino wrote the said letter with the intent that the said Julius C. Smith should make inquiries and examination, and should report as to the truth of the statements contained in the said advertisement, that there was nothing in said letter of Cuttino to Smith to apprise Smith of this intent of said Cuttino; and that, therefore, said Smith was justified in answering said letter and giving such information as he himself had without further inquiry.

XIV. Because his Honor erred in not holding that neither the plaintiff, Geo. H. Chapin, or S. L. Beasley, had any notice of the terms of the agency of the said J. C. Smith for defendants, nor what were the duties of the said Smith expected of him by the defendants.

30—46

XV. Because his Honor held that plaintiff had knowledge of the agreement between Chapin and Smith; whereas he should have held that, whilst plaintiff had knowledge of the fact that said Smith was to be paid a commission, he had no knowledge of the relation of Smith to defendants, or of any collusion or fraud between said Smith and Chapin.

XVI. Because his Honor erred in not holding that the defendants, having ratified the acts of their agent, Smith, by retaining possession for a long time of the place purchased, and having undertaken to hold their said agent, Smith, liable for alleged misrepresentations, they cannot now deny their liability upon the notes executed by them to plaintiff, on the ground of the employment of Smith as Chapin's agent.

XVII. Because his Honor erred in not holding that the defendants were estopped to avail themselves as a defence to this action of the fact that Smith was paid by Chapin or S. L. Beasley a commission for his services in perfecting said sale, by the fact that they did not rescind or offer to rescind said sale, when informed of Smith's having so received such commissions, or within a reasonable time thereafter, and did not accept plaintiff's offer to rescind.

XVIII. Because his Honor erred in not holding that, even if it be true that the plaintiff had paid the said Smith a commission for the sale of said premises, and that such act must be regarded as collusion between plaintiff and the agent of defendants, nevertheless that the remedy of defendants was confined to a rescission of the contract of sale within a reasonable time after discovery of said fraud, and a recovery by defendants of what they had paid, together with such damages as they had suffered by reason of such fraud up to the time of the discovery thereof.

XIX. Because his Honor erred in holding that the defendants had sustained their counter-claim, and are entitled to judgment against plaintiff for the sum of $1,227; whereas he should have held that the defendants had failed to sustain their counter-claim, and that the plaintiff was entitled

to judgment of foreclosure for the amount due upon the notes executed by the defendants, as reported by the master.

XX. Because his Honor erred in decreeing that the complaint of plaintiff should be dismissed, his demand for foreclosure refused; that the amount due on said note as of date of execution should be deducted from the amount of counter-claim, and judgment be given for defendant against plaintiff for the balance of the counter-claim as allowed, to wit: $227; whereas he should have held plaintiff was entitled to a judgment of foreclosure for the amount due on said notes.

XXI. Because his Honor erred in not giving judgment of foreclosure to plaintiff against defendants for the sum of $1,144 and interest thereon after July 1st, 1895.

XXII. Because his Honor erred in requiring plaintiff to surrender his notes and mortgage, and in requiring said mortgage to be satisfied on record, and in requiring plaintiff to pay the costs and disbursements of this action.

*Messrs. Haynesworth & Parker*, for appellant.

*Messrs. Shuman & Dean*, contra.

March 26, 1896. The following opinion was delivered by

MR. CHIEF JUSTICE MCIVER. This was an action to foreclose a mortgage on real estate, given to secure the payment of the amount due on a note for the balance of the purchase money of the mortgaged premises. The defendants in their answer admitted the allegations in the complaint as to the execution of the note and mortgage, and that no part thereof had been paid; but they set up in their answer a counter-claim for damages, alleged to have been sustained by them by reason of certain misrepresentations alleged to have been made by the agents of the plaintiff, as to the condition of the said property. It seems that the plaintiff, having removed from the land in question, situated near the city of Greenville S. C., where he had formerly resided, to the State of Florida, placed this property in the

hands of one Chapin, a real estate broker, with instructions
to sell the same.    With a view to effect this purpose, Cha-
pin inserted in several newspapers, amongst others the
Charleston News and Courier, an advertisement offering
the land for sale at the price of $2,000, in which there was
a glowing description of the advantages of the place, which
advertisement concluded in these words: "Apply to S. L.
Beasley on the premises, or to Geo. H. Chapin & Co., 257
Washington st., Boston;" the said S. L. Beasley, as it ap-
pears in the testimony, being a son of plaintiff, and the said
Chapin, though doing business in Boston, residing for a
part of the year in the city of Greenville, South Carolina.
This advertisement having attracted the attention of David
S. Cuttino, a resident of the city of Charleston, the husband
of the defendant, Josephine, and the nephew, by marriage,
of the defendant, Swinton, who was a resident of the town
of Beaufort, South Carolina, and he, knowing that his wife
and her uncle desired to purchase property of the character
mentioned in the advertisement, opened a correspondence
with a friend of long standing, Julius C. Smith, a resident
of the city of Greenville, requesting information as to the
property offered for sale.    The first letter in this corres-
pondence, as printed in the "Case," bears date 20th of June,
*1895*, which is manifestly a misprint for *1893*, as the reply
to it bears date 23d June, 1893.    The result of this corres-
pondence was, that David S. Cuttino, as the agent of the
defendant, through his agent, the said Julius C. Smith,
entered into a contract for the purchase of the property at
the price of $2,000, and the contract appears to have been
carried out on the 1st of July, 1893, by the payment of one-
half of the purchase money in cash, and the execution of
the note and mortgage above referred to, for the other half,
and the execution of a deed from plaintiff to the defendants
for the said property.    On the 17th of August, 1893, the
defendants took possession of the property, and, finding that
the property did not come up to their expectations, they
began to make complaints, and other correspondence ensued

between the parties, conducted by Messrs. Shuman & Dean, as attorneys for defendants, which finally culminated in this action.

The master, to whom it was referred to take and report the testimony, together with his findings of fact and conclusions of law, made his report, in which he disallowed the counter-claim set up by defendants, and found that the plaintiff was entitled to judgment of foreclosure for the amount which he found to be due on the note on the 1st of July, 1895. To this report the defendants excepted, and the case was heard by his Honor, Judge Aldrich, upon the report and exceptions, who rendered judgment overruling the report of the master, allowing defendants' counter-claim to the amount of $1,227, from which he deducted the face of the note, $1,000, and rendered judgment in favor of the defendants against the plaintiff for the excess, to wit: for $227. From this judgment plaintiff appeals, upon the several grounds set out in the record. For a full understanding of the facts of the case and the questions involved, it will be necessary for the Reporter to embrace in his report of the case the correspondence between the parties above referred to, both by mail and telegraph, the report of the master, the decree of the Circuit Judge, and the exceptions for the purposes of this appeal, as the foregoing statement is intended merely as a brief outline of the general history of the controversy between these parties.

The Circuit Judge seems to have rested his conclusions upon the following propositions: That the advertisement was intended as a representation of the condition of the property; that such representation was false; that defendants acted upon such false representations; that such false representations were confirmed by the report of the said Smith, who, by his agreement to divide commissions with Chapin, the agent originally deputed by plaintiff to sell the property, became the agent of plaintiff, who thereby became responsible for such false representations.

It is obvious that the first inquiry is whether the advertise-

ment was intended as a representation of facts, as to condition of the property upon which persons were invited to buy; and, next, whether the defendants in this case acted upon the representations contained in the advertisement. Now, as to the intent of the advertisement, it seems to us very doubtful, to say the least of it, whether it was intended or expected that purchasers would buy, relying on the statements as to the condition of the property contained in the advertisement; for, to say nothing of the fact that common sense and the most ordinary prudence would negative the idea that persons could be expected to buy property, easily susceptible of examination, without making such examination for themselves or having it made by others upon whom they could rely. The terms of the advertisement itself, in its concluding words, indicated that it was not expected that the persons wishing to buy would rely upon the representations made in the advertisement, for such persons were invited to apply to S. L. Beasley, on the premises, or to Chapin, at his office; and the testimony in the "Case" shows that at least one person wishing to buy— a Mr. Ravenel, from Charleston—did apply to S. L. Beasley, who, it seems, was a son of plaintiff and left on the premises in charge of the property, and was shown over the place by said Beasley, and expressed himself as pleased with the property. But whether the plaintiff, or his agent, Chapin, who inserted the advertisement in the newspapers, intended it as a representation of facts *as* to the condition of the property upon which persons wishing to buy were expected to rely, becomes immaterial in view of the fact, which we think is most abundantly established, that neither the defendants nor their agent, David S. Cuttino, did rely upon the representations contained in the advertisement, for the very first step which Cuttino took was to consult his friend Smith, a prominent business man of high reputation, living in Greenville, near by the property offered for sale, as to its condition and value; and it is a very significant circumstance, in this connection, that Cuttino, in

his letter to Smith, does not ask him whether the property comes up to the representations made of it in the advertisement, which he enclosed, but simply asks for information about the property, "Give me your candid opinion as to price, and if you think any money can be made on it." To this letter Smith promptly replied by postal card, saying he wanted to make some inquiries, and that he would write as soon as he could get the information, concluding in these words: "*Hold up until I do.*" These concluding words show very plainly that Smith did not suppose that Cuttino would act upon the representations contained in the advertisement, but expected him to wait—"hold up"—until he obtained the information which he desired. Accordingly, on the very next day, Smith wrote Cuttino fully upon the subject; and it is observable that there is nothing whatever said in that letter as to whether the property came up to the representations made in the advertisement, and, on the contrary, Smith, in that letter, gives Cuttino the information which he had obtained in reference to the property, and expresses his opinion as to its value. In the postscript to that letter we find these words: "Come up, and I will take you out;" showing that Smith was willing and anxious that Cuttino should come up and examine the property for himself. Upon receipt of this letter by Cuttino, Smith was instructed, by telegraph, to buy the property at once—"close promptly"—and, accordingly, the agreement for the purchase was entered into. It seems to us, therefore, that there is no foundation for the conclusion that defendants, in buying the property, relied upon the representations contained in the advertisement; but, on the contrary, they relied solely upon the information and advice which they sought and received from their agent, Smith; and the testimony tends to show that the defendants so regarded it, for when they took possession of the property and found themselves disappointed in its condition, they, at first, proposed to hold Smith liable for the misrepresentations which they alleged he had made to them.

The next inquiry is as to the effect of the fact that Smith, before writing the letter to Cuttino, above referred to, had made an arrangement with Chapin to share with him commissions which plaintiff had agreed to pay Chapin for selling the property. While we agree with the Circuit Judge that the law regards with reprobation such conduct on the part of an agent, because of its tending to tempt him to betray his trust, yet we are not exactly prepared to endorse the proposition that such an arrangement made Smith the agent of the plaintiff, to such an extent as would render the plaintiff liable to the defendants for any false representations made by Smith (if, indeed, he made any) to the defendants, whereby they sustained damages. But in the view which we take of the testimony we do not think it necessary to express ourselves authoritatively as to that proposition. For we do not think that the testimony shows that Smith made any false representations to the defendants or their agent, David S. Cuttino. If, as we have seen, Smith never confirmed, or was asked to confirm, the representation made in the advertisement as to the condition of the property, then we must look alone to the letter of Smith to Cuttino, bearing date 24th of June, 1893, for that appears to be the only representation which he ever made to Cuttino as to the condition of the property. Now we do not find any testimony showing that any statement made in that letter was false. On the contrary, all the testimony was directed to showing that the representations made in the advertisement were false. Whether the fact that Smith made this arrangement with Chapin to divide the commissions would not, of itself, justify the defendants in repudiating the act of their agent, Smith, in making the purchase of the property, and demanding a rescission of such contract, is another question, upon which we are not called upon to express any opinion, as that question cannot arise under the present action, which is not an action for rescission of the contract but simply an action, in the form of a counter-claim, for damages. But even if it should be conceded that the defendants were entitled to re-

cover any damages at all, it seems to us that the Circuit Judge erred in the rule which he applied for the measure of such damages. The true rule in cases like this is the difference between the value of the property if it had been in the condition in which it was represented to be, and its value in the condition in which it actually was. All experience shows that the value of real property is not enhanced to the extent of *the cost* of the improvements which may be put upon it; and the testimony in this case affords a striking illustration of the truth of this proposition. The testimony shows that the plaintiff had put improvements upon the property at a cost exceeding its market value as ascertained by this sale. To apply the measure of damages adopted by the Circuit Judge would in most cases, and certainly does in this case, work manifest injustice; for the result is that the defendants obtained property which the master found to be well worth the sum of $2,000, and only pay for the same the sum of $773.

The judgment of this Court is, that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for such further proceedings as may be necessary to carry out the views herein announced.

MR. JUSTICE GARY concurs in result in following opinion: I concur in so much of the judgment announced by Mr. Chief Justice McIver in the foregoing opinion as reverses the judgment of the Circuit Court on the question of damages, and remands the case to the Circuit Court for further proceedings, because there was error on the part of the Circuit Judge in the mode by which he assessed the damages. The damages should be assessed by ascertaining what would have been the value of the property if it had been in the condition in which it was represented to be, then deducting from such valuation the value of the property in the condition in which it actually was at the time of sale. The case, in my opinion, should be remanded to

the Circuit Court for such further proceedings only as may be necessary to carry out this view.

Mr. JUSTICE POPE, concurring with Mr. Justice Gary: I do not feel that the respective agents of the plaintiff and defendants intended to injure the defendants, and yet such was the effect of their conduct in the premises. I concur, therefore, with Mr. Justice Gary, that the judgment of the Circuit Court should be reversed only so far as the method adopted by the Circuit Judge in ascertaining the damages of the defendants is concerned. I think Mr. Justice Gary lays down the correct rule for the ascertainment of such damages, and that the action should be remitted to the Circuit Court for the purpose of enforcing such rule.